**ORAL ARGUMENT NOT YET SCHEDULED**

# United States Court of Appeals for the District of Columbia Circuit

**No. 20-5195**

OPEN TECHNOLOGY FUND, ET AL.,
*Plaintiffs-Appellants*,

v.

MICHAEL PACK, IN HIS OFFICIAL CAPACITY AS CHIEF EXECUTIVE OFFICER AND DIRECTOR OF THE U.S. AGENCY FOR GLOBAL MEDIA
*Defendant-Appellee.*

On Appeal from the
United States District Court for the District of Columbia,
No. 1:20-cv-01710-BAH (Hon. Beryl A. Howell)

**BRIEF OF INTERNET FREEDOM ADVOCATES AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Kevin K. Russell
Charles H. Davis
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
(800) 574-2033 (fax)
krussell@goldsteinrussell.com
cdavis@goldsteinrussell.com

*Counsel for Amici Curiae*

July 24, 2020

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amici curiae* Internet Freedom Advocates hereby certify as follows:

**(A) Parties and *Amici*.** All parties, intervenors, and *amici* appearing before the district court and in this court are listed in the Opening Brief for Plaintiffs-Appellants, in addition to the *amici* listed in the Addendum to this Brief.

**(B) Rulings Under Review.** References to the rulings at issue appear in the Opening Brief for Plaintiffs-Appellants.

**(C) Related Cases.** Counsel are unaware of any related cases in this Court. This case is related to *District of Columbia v. Open Technology Fund*, Case No. 2020-CA-003185-B (D.C. Super. Ct. July 20, 2020).

July 24, 2020

/s/ Kevin K. Russell
Kevin K. Russell

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, Petitioners submit the following corporate disclosure statements:

**Access Now** is an international civil society organization registered as a 501(c)(3) non-profit in the United States of America. It has no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

**The App Coalition** is a member-led organization with no parent companies, subsidiaries or affiliates that have issued shares to the public.

**ARTICLE 19** is a 501(c)(3) non-profit corporation and has not issued shares to the public, nor does it have any parent companies, subsidiaries or affiliates that have issued shares to the public. ARTICLE 19 is a recipient of funding from OTF to support capacity building for internet freedom communities.

**The Benton Institute for Broadband & Society** is a non-profit corporation with no parent companies, subsidiaries, or affiliates and none of them have issued shares to the public.

**The Center for Democracy and Technology** is a non-profit, non-stock corporation organized under the laws of the District of Columbia. CDT has no parent corporation, nor is there any publicly held corporation that owns stock or other interest in CDT.

**The Center on Privacy & Technology at Georgetown Law** is a program within Georgetown University, a non-partisan, non-profit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**The Committee to Protect Journalists** is a national, non-partisan, non-profit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Electronic Frontier Foundation** is a national, non-partisan, non-profit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Free Press** is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Human Rights Watch** is a 501(c)(3) non-profit group organized under the laws of New York. Human Rights Watch has no parent corporation and no stock; it has never accepted support from OTF, and it does not accept any government funding.

**Media Alliance** is a 501(c)(3) non-profit California corporation and has not issued shares to the public. Media Alliance does not have any parent companies, subsidiaries or affiliates that have issued shares to the public.

**Media Democracy Fund** is a project of the New Venture Fund, a non-profit corporation incorporated in the District of Columbia. The New Venture Fund has no parent corporation, and no publicly held corporation owns 10% or more of its stock, as New Venture Fund is a nonstock corporation.

**Mozilla Corporation** is a subsidiary of the Mozilla Foundation, a non-profit corporation that has not issued shares or debt securities to the public. The Mozilla Foundation does not have any parent companies, subsidiaries (direct or indirect) or branches that have issued shares or debt securities to the public.

**Open Technology Institute** is a program within the New America Foundation. New America is a national, non-partisan, non-profit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Ranking Digital Rights** is a program within the New America Foundation. New America is a national, non-partisan, non-profit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**The Tor Project** is a 501(c)(3) non-profit corporation and has not issued shares to the public and does not have any parent companies, subsidiaries, or affiliates that have issued shares to the public.

**The Wikimedia Foundation** is a non-profit organization with no parent corporation. No publicly held corporation owns 10% or more of its stock or other interest in the organization.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENTS ............ ii

TABLE OF AUTHORITIES ............ vii

GLOSSARY ............ xi

STATEMENT OF INTEREST OF AMICI CURIAE ............ 1

STATUTES AND REGULATIONS ............ 2

SUMMARY OF ARGUMENT ............ 2

ARGUMENT ............ 7

I. OTF's Mission Depends On The International Community Having Confidence In OTF's Independence From The Government. ............ 7

A. OTF Is Charged With Promoting Democracy And Internet Freedom By Providing Citizens Of Repressive Regimes Tools For Avoiding State Censorship And Surveillance. ............ 8

B. The Success Of OTF's Mission Depends On Fostering International Confidence In The Integrity Of Its Technology And Projects, Which Turns In Significant Part On The Public's Belief In OTF's Independence. ............ 11

II. The Government's Reading Of The Statute Would Render It Unconstitutional Under The First Amendment. ............ 18

III. The Government's Position Contravenes Settled Limits On The Government's Power To Condition Federal Grants. ............ 21

A. Spending Clause Conditions Must Be Unambiguous. ............ 21

B. Requiring OTF To Agree To Government Control Of The Organization As A Condition For Receiving Federal Grants Would Constitute An Unconstitutional Condition. ............ 23

IV. Even If OTF's Bylaws Invited USAGM To Appoint Its Board, The Agency Lacked Legal Authority To Accept The Invitation. ............ 24

CONCLUSION ............ 27

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)....................23

*Alexander v. Sandoval*,
532 U.S. 275 (2001)....................22

*Am. Mail Line Ltd. v. FMC*,
503 F.2d 157 (D.C. Cir. 1974)....................25

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987)....................19

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000).................... 19, 20

*Cal. Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)....................25

*Columbia Gas Transmission Corp. v. FERC*,
404 F.3d 459 (D.C. Cir. 2005)....................6, 25

*Eu v. S.F. Co. Democratic Cent. Comm.*,
489 U.S. 214 (1989).................... 19, 20

*Grove City College v. Bell*,
465 U.S. 555 (1984)....................22

*Hosanna-Tabor v. EEOC*,
565 U.S. 171 (2012)....................20

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981).................... 5, 21, 22

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984)....................19

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006)....................23

*Rust v. Sullivan*,
500 U.S. 173 (1991) .......... 5, 23, 24

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 22

*Weinberger v. Bentex Pharms., Inc.*,
412 U.S. 645 (1973) .......... 25

**Statutes**

12 U.S.C. § 6209 .......... 26

Further Consolidated Appropriations Act of 2020,
Pub. L. No. 116-94, 133 Stat. 2534 (2019) .......... 24

**Other Authorities**

1 News, *WhatsApp Helps Hong Kong Protesters Evade Police*, Sep. 29, 2014, https://www.tvnz.co.nz/one-news/world/whatsapp-helps-hong-kong-protesters-evade-police-6095502 .......... 9

Adrian Shahbaz & Allie Funk, *The Crisis of Social Media*, FREEDOM HOUSE (Nov. 2019), https://freedomhouse.org/sites/default/files/2019-11/11042019_Report_FH_FOTN_2019_final_Public_Download.pdf .......... 12

Dan De Luce, *Trump's New Global Media Chief Fires Top Editor at Radio Free Asia*, NBC NEWS (July 9, 2020), https://www.nbcnews.com/news/europe/trump-s-new-global-media-chief-fires-top-editor-radio-n1233321 .......... 17

David Kirkpatrick, *Israeli Software Helped Saudis Spy on Khashoggi, Lawsuit Says*, N.Y. TIMES (Dec. 2, 2018), https://www.nytimes.com/2018/12/02/world/middleeast/saudi-khashoggi-spyware-israel.html .......... 13

Dep't of State, BAHRAIN 2018 HUMAN RIGHTS REPORT (2019) .......... 4

Dep't of State, VIETNAM 2019 HUMAN RIGHTS REPORT (2020) .......... 4

Felix Tam, *Signal Tops Hong Kong Downloads After Fears of China Law Deepen*, BLOOMBERG (July 8, 2020), https://www.bloomberg.com/news/articles/2020-07-08/signal-messenger-rockets-up-hong-kong-download-charts ........................................11

Human Rights Watch, *UAE: Award-Winning Activist Jailed for 10 Years*, https://www.hrw.org/news/2018/06/01/uae-award-winning-activist-jailed-10-years........................................................................................12

International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171 ..............................................................................................20

Jan L. Lacobowitz & Justin Ortiz, *Happy Birthday Siri: Dialing in Legal Ethics for Artificial Intelligence, Smartphones, and Real Time Lawyers*, 4 TEX. A&M J. PROP. L. 407 (2018) ........................................13

Katrina Manson, *US Boosts Funding of Tech Companies to Help Anti-Tehran Protests*, THE FINANCIAL TIMES (Jan. 19, 2020), https://www.ft.com/content/740a385a-3924-11ea-a6d3-9a26f8c3cba4 ...................................................................................................9

Letter to Congress: Regarding The Independence And Community Trust Of The Open Technology Fund, MEDIUM (July 22, 2020), *available at* https://medium.com/@community.space/open-letter-re-the-independence-and-community-trust-of-the-open-technology-fund-893db83f7714 ..........................................................................16

Mark Mazzetti, Adam Goldman, Ronen Bergman, Nicole Perlroth, *A New Age of Warfare: How Internet Mercenaries Do Battle for Authoritarian Governments*, N.Y. TIMES (Mar. 21, 2019), https://www.nytimes.com/2019/03/21/us/politics/government-hackers-nso-darkmatter.html ......................................................................12

Meghan Neal, *Tor is Being Used as a Safe Haven for Victims of Cyberstalking, Motherboard*, VICE (May 9, 2014), https://www.vice.com/en_us/article/3dkdjb/tor-is-being-used-as-a-safe-haven-for-victims-of-cyberstalking ...........................................................10

Open Tech. Fund, *2015 Annual Report*, https://public.opentech.fund/documents/2015otfannualreport.pdf....................13

Open Tech. Fund, *Fake Antenna Detection Project*, https://www.opentech.fund/results/supported-projects/seaglass-imsi-catcher-detection-latin-america/....................................11

Open Tech. Fund, *FY 2018 Annual Report*, https://public.opentech.fund/documents/OTF_FY2018_Annual_Report.pdf..............................................................................................11

Open Tech. Fund, *May 2020 Monthly Report*, https://www.opentech.fund/news/may-2020-monthly-report/ ...........................10

Open Tech. Fund, *On Community Building & Rapid Response*, https://www.opentech.fund/news/community-building-rapid-response/ .......................................................................................... 14, 17

Open Tech. Fund, *Open Whisper Systems*, https://www.opentech.fund/results/supported-projects/open-whisper-systems/.........................................................................................9

Open Tech. Fund, *Tails,* https://www.opentech.fund/results/supported-projects/tails/ .............................10

Save Internet Freedom Tech, *Why Save OTF?*, https://saveinternetfreedom.tech/information/otf-accomplishments/.........................................................................................9

Sean La Roque-Doherty, *Alternatives to Email Give Law Clients Secure Communication Options*, ABA JOURNAL (Oct. 1, 2018), https://www.abajournal.com/magazine/article/alternatives_email_secure_communication...........................................................................13

U.S. Agency for Glob. Media, *Open Technology Fund*, Nov. 22, 2019, https://www.usagm.gov/wp-content/uploads/2019/11/FINAL-USAGM-OpenTechnologyFund-11-22-19.pdf.............................................8, 9

# GLOSSARY

| | |
|---|---|
| NSA | National Security Administration |
| OTF | Open Technology Fund |
| USAGM | U.S. Agency for Global Media |

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

Amici curiae identified in the Addendum are organizations and companies dedicated to supporting and promoting democracy and human rights through free and open access to the Internet throughout the world. All have an interest in the continued effectiveness of OTF as partner in these efforts. In addition, many of amici and their constituents rely upon technologies developed by OTF to advance amici's missions. And some have, or have had in the past, contracts with OTF to develop and implement technologies to support free use of the Internet, including to circumvent censorship and surveillance by authoritarian regimes.

Amici file this brief to explain why it is critical to OTF's mission that it be perceived throughout the world as operationally independent from any government, including the government of the United States. The brief further addresses the significant and broad-ranging consequences of the Government's breathtaking assertion of authority to take control of a private advocacy organization, an authority that cannot be squared with the language of the statute or OTF bylaws upon which

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that (1) this brief was authored entirely by counsel for amici curiae and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from amici curiae and their counsel, no other person contributed money to fund preparing or submitting this brief. All parties have consented to the filing of this amicus brief.

the Government relies, much less the Constitution's constraints on government control over private expressive organizations.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are contained in the addendum to the Opening Brief of Plaintiffs-Appellants.

## SUMMARY OF ARGUMENT

**I.** The Open Technology Fund (OTF) is a private nonprofit devoted to advancing Internet freedom, and democratic values more broadly, through technology that allows users living under repressive regimes to avoid government censorship and surveillance on the Internet. The Government argues in this appeal that Congress, and indeed OTF itself, intended to empower a federal agency, the U.S. Agency for Global Media (USAGM), to take control of this private political advocacy organization by replacing OTF's Board of Directors with Trump Administration officials and political supporters chosen by Michael Pack, USAGM's Director. That claim is wildly implausible for many reasons. To start, both Congress and OTF have understood from the beginning that OTF cannot perform its important mission unless the international community views it as independent of the Government.

The digital tools OTF supports are used by more than 2 billion ordinary citizens, protesters, journalists, and activists to engage in activities—like visiting

uncensored news sources or voicing political dissent on the Internet—that are often taken for granted here, but are illegal in much of the world. People living under tyranny thus put their liberty, and sometimes their lives, on the line in using the digital tools OTF helped create. They will not do so unless they are confident that the technology is secure, protecting them from surveillance or sabotage not only from their own governments, but from *any* government. Particularly in light of the very public revelations of the National Security Administration's (NSA's) sweeping, clandestine surveillance programs, activists and ordinary citizens alike will reasonably wonder whether the U.S. Government will use its control over OTF to advance intelligence gathering and other political ends, in conflict with OTF's single-minded focus on ensuring free and private access to the Internet.

**II.** The Government's reading of the statutory language is also implausible because it would render the Act unconstitutional under the First Amendment. The independence of private entities from pervasive Government control is a hallmark of democracy, protected by the First Amendment's guarantee of freedom of association.[2] Burdens on that freedom—including Government attempts to dictate

---

[2] Civic space is closing in many countries, a threat and trend the United States recognizes and should take care to prevent at home. Indeed, the U.S. State

the membership or leadership of a private advocacy group like OTF and *amici*—are unconstitutional unless justified by a compelling governmental interest. Here, the Government does not even attempt to identify any significant interest in controlling OTF's Board, now that OTF has become an entirely private nongovernmental organization, other than the fact that a federal agency provides the group financial assistance. If that were enough, the autonomy of countless private advocacy groups, charities, and businesses would be in jeopardy, for the Federal Government provides similar grants, subsidies, and tax breaks to countless non-governmental organizations, including many of *amici*. While Congress has the power to attach conditions to federal funds, as discussed next, that power provides no basis for the Government's claims in this case.

**III.** The district court brushed aside any First Amendment concerns because it concluded that OTF volunteered for a government takeover by accepting a funding condition that required giving USAGM the power to replace OTF's Board and then

---

Department has criticized other governments' interference with the private control of civil society groups as violations of freedom of association principles. *See, e.g.*, Dep't of State, BAHRAIN 2018 HUMAN RIGHTS REPORT 19 (2019), *available at* https://www.state.gov/wp-content/uploads/2019/03/BAHRAIN-2018.pdf; Dep't of State, VIETNAM 2019 HUMAN RIGHTS REPORT 23 (2020), *available at* https://www.state.gov/wp-content/uploads/2020/03/VIETNAM-2019-HUMAN-RIGHTS-REPORT.pdf.

incorporating that concession into its bylaws. The district court's reasoning was flawed in two respects.

First, the district court disregarded settled Spending Clause precedent holding that if the Government "intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Here, even the district court admitted that the funding condition was "ambiguous" regarding OTF's obligation to accept Government control over its Board. Op. 20.

Second, even if the grant agreement had unambiguously required OTF to allow USAGM to appoint Board members, that requirement would have amounted to an unconstitutional condition on the funding under the First Amendment. The Constitution prohibits the Government from placing "a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (emphasis in original). There could hardly be a clearer example of the Government attempting to control the *recipient*, as opposed to the federally funded program, than when an agency claims the power to appoint a grantee's board of directors, who will oversee every facet of the organization's activities, not just those funded with federal dollars.

**IV.** Finally, even if OTF's bylaws had invited the Government to control its Board, there would remain the question, unaddressed below, whether Secretary Pack has legal authority to accept the invitation. That authority cannot simply be assumed. If, for example, a defense contractor invited the Secretary of Defense to appoint members of the company's board, one would not simply assume that the Secretary was authorized to accept that offer. Indeed, Congress could have good reasons for *not* authorizing such entanglement between the Defense Department and its contractors.

Here, too, for the reasons discussed, Congress would have had good reason to protect OTF's international reputation by prohibiting USAGM from taking control of its Board, even by invitation. This is surely why, as the district court rightly held, the only statutory provision addressing the question gave USAGM power to control the boards of *other* quasi-governmental organizations, but not OTF. No agency or private party has the authority to countermand that decision by agreement or otherwise. *See, e.g.*, *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 463 (D.C. Cir. 2005) (federal agencies' power to regulate private parties "cannot arise from the absence of objection, or even from affirmative agreement") (citations omitted).

## ARGUMENT

Earlier this summer, a political appointee of a federal agency purported to dismiss the board of directors of a private, non-profit advocacy group and install replacement leadership of his own choosing. It would be truly surprising if the laws of any democracy afforded its government such powers. That is particularly so here, where Congress has provided substantial funding to OTF on the understanding that its mission requires the world to perceive OTF as independent of any government. In fact, as the district court rightly found, no Act of Congress provides USAGM the power it asserts, nor could it without violating the First Amendment.

The district court nonetheless concluded that USAGM had successfully conditioned OTF's federal funding on it ceding its vital independence to the agency's political appointees and that OTF had agreed in its bylaws to that supervision. But OTF's grant contained no such condition, nor could it under the First Amendment. And even if OTF voluntarily invited USAGM to appoint its Board, the agency has identified no source of lawful authority to accept that offer.

### I. OTF's Mission Depends On The International Community Having Confidence In OTF's Independence From The Government.

As OTF has explained, neither the International Broadcasting Act, nor OTF's 2019 grant agreement, nor anything in OTF's bylaws authorized Director Pack to replace OTF's leaderships with individuals of his own choosing under a plain reading of the relevant provisions. That conclusion is reinforced by consideration

of the goals of all three documents, which are to advance OTF's critical mission to promote global democracy by facilitating free access to the Internet. As described below, Congress and OTF understood the success of this mission depends vitally on the international community having confidence in OTF's independence from any government, including our own.

### A. OTF Is Charged With Promoting Democracy And Internet Freedom By Providing Citizens Of Repressive Regimes Tools For Avoiding State Censorship And Surveillance.

OTF was established as an independent, non-governmental nonprofit in 2019 under the laws of the District of Columbia. Its mission is "to advance Internet freedom in repressive environments by supporting the research, development, implementation, and sustainability of technologies that provide secure and uncensored access to the Internet to counter attempts by authoritarian governments to control the Internet and restrict freedom online."[3] OTF pursues that mission by contracting with a wide range of private groups to develop technologies to "combat censorship and repressive surveillance," as well as to help journalists and other civil society groups rapidly respond to hostile cyberattacks and other "digital

---

[3] U.S. Agency for Glob. Media, *Open Technology Fund*, Nov. 22, 2019, at 1, https://www.usagm.gov/wp-content/uploads/2019/11/FINAL-USAGM-OpenTechnologyFund-11-22-19.pdf.

emergencies."[4] The organization's work spans the globe, with recipients in every major region of the world, and benefits that reach over 2 billion users.[5]

For example, OTF contractors developed encryption technology commonly used in popular messaging apps like WhatsApp and Facebook Messenger,[6] empowering citizens in repressive regimes to communicate freely without fear of government surveillance.[7] OTF also provides digital tools that allow users to circumvent government censorship of the Internet. For example, OTF contractors have provided Iranian citizens access to Virtual Private Networks, which allow users to access the broader Internet while masking their identity from potential eavesdropping or tracking by the government.[8] Such censorship circumvention tools are used by millions of people living in Internet-restricted countries to access the

---

[4] Save Internet Freedom Tech, *Why Save OTF?*, https://saveinternetfreedom.tech/information/otf-accomplishments/.

[5] U.S. Agency for Glob. Media, *Open Technology Fund*, Nov. 22, 2019, at 1, https://www.usagm.gov/wp-content/uploads/2019/11/FINAL-USAGM-OpenTechnologyFund-11-22-19.pdf.

[6] Open Tech. Fund, *Open Whisper Systems*, https://www.opentech.fund/results/supported-projects/open-whisper-systems/.

[7] *See* 1 News, *WhatsApp Helps Hong Kong Protesters Evade Police*, Sep. 29, 2014, https://www.tvnz.co.nz/one-news/world/whatsapp-helps-hong-kong-protesters-evade-police-6095502.

[8] Katrina Manson, *US Boosts Funding of Tech Companies to Help Anti-Tehran Protests*, THE FINANCIAL TIMES (Jan. 19, 2020), https://www.ft.com/content/740a385a-3924-11ea-a6d3-9a26f8c3cba4.

uncensored Internet.[9] More broadly, countless people all over the world rely on encryption technology and tools supported by OTF to protect the privacy of their personal associations, communications, and interests.[10]

In addition, one of OTF's most critical missions is to provide rapid, multifaceted support to democracy advocates during times of crisis. While many rapid response projects are not discussed publicly due to the dangers this could cause for activists and organizers abroad, a few examples have been publicly disclosed. For example, as protests erupted in Hong Kong, OTF worked quickly with local partners, technologists, and digital security experts to build on efforts started during the 2019 protests to prepare Hong Kong citizens for CCP-imposed censorship and surveillance.[11] Among other things, OTF led the creation of a digital security guide

---

[9] Open Tech. Fund, *May 2020 Monthly Report*, https://www.opentech.fund/news/may-2020-monthly-report/.

[10] *See* Open Tech. Fund, *Tails,* https://www.opentech.fund/results/supported-projects/tails/. For example, some domestic violence victims use OTF-supported applications to protect themselves from digital surveillance at home. https://tails.boum.org/donate/index.en.html. OTF contractors have worked directly with social workers and domestic violence advocates to educate them about countersurveillance techniques, including OTF-supported tools. *See* Meghan Neal, *Tor is Being Used as a Safe Haven for Victims of Cyberstalking, Motherboard*, VICE (May 9, 2014), https://www.vice.com/en_us/article/3dkdjb/tor-is-being-used-as-a-safe-haven-for-victims-of-cyberstalking.

[11] Open Tech. Fund, *May 2020 Monthly Report*, July 1, 2020, https://www.opentech.fund/news/may-2020-monthly-report/.

for protestors and media outlets,[12] which led many protestors to use OTF-support tools to conceal their identities while accessing sensitive content.[13]

In Venezuela, OTF has provided similar assistance, including defending a leading Venezuelan human rights organization and a network of Venezuelan journalists against government-sponsored hacking attempts, coordinating with local partners to deploy anti-censorship tools, and tracking censorship measures so that journalists could report on them.[14] OTF also supported groundbreaking research to detect and mitigate efforts to use fake cellphone towers to intercept mobile communications in Venezuela and throughout Latin America.[15]

### B. The Success Of OTF's Mission Depends On Fostering International Confidence In The Integrity Of Its Technology And Projects, Which Turns In Significant Part On The Public's Belief In OTF's Independence.

There is little point in creating secure digital tools if no one will trust and use them. And here, trust is key. In encouraging use of its secure communications

---

[12] Open Tech. Fund, *FY 2018 Annual Report*, at 20, https://public.opentech.fund/documents/OTF_FY2018_Annual_Report.pdf.

[13] Felix Tam, *Signal Tops Hong Kong Downloads After Fears of China Law Deepen*, BLOOMBERG (July 8, 2020), https://www.bloomberg.com/news/articles/2020-07-08/signal-messenger-rockets-up-hong-kong-download-charts.

[14] Open Tech. Fund, *FY 2018 Annual Report*, at 20, https://public.opentech.fund/documents/OTF_FY2018_Annual_Report.pdf.

[15] Open Tech. Fund, *Fake Antenna Detection Project*, https://www.opentech.fund/results/supported-projects/seaglass-imsi-catcher-detection-latin-america/.

technologies, OTF is asking dissidents in violent and repressive regimes to trust that the technologies will ensure that their communications will not fall into the hands of government agents, often when exposure could lead to imprisonment or even death. One research project found that "more repressive governments are acquiring social media surveillance tools that employ artificial intelligence to identify perceived threats and silence undesirable expression" and that 47 of the 65 countries studied "featured arrests of users for political, social, or religious speech."[16] In other words, of the 3.8 billion people in the world with access to the Internet, an estimated 71% live in a country where they could be arrested or imprisoned for posting a dissenting opinion on social media. *Ibid*.

Examples of such repression are all too easy to find. Ahmed Mansoor, a human rights activist in the United Arab Emirates, lost his job and his house, and is currently in prison in no small part because his phone was compromised with spyware.[17] Saudi officials unsuccessfully attempted to use malicious software in an

---

[16] Adrian Shahbaz & Allie Funk, *The Crisis of Social Media*, FREEDOM HOUSE, 2 (Nov. 2019), https://freedomhouse.org/sites/default/files/2019-11/11042019_Report_FH_FOTN_2019_final_Public_Download.pdf.

[17] Mark Mazzetti, Adam Goldman, Ronen Bergman, Nicole Perlroth, *A New Age of Warfare: How Internet Mercenaries Do Battle for Authoritarian Governments*, N.Y. TIMES (Mar. 21, 2019), https://www.nytimes.com/2019/03/21/us/politics/government-hackers-nso-darkmatter.html; Human Rights Watch, *UAE: Award-Winning Activist Jailed for 10 Years*, https://www.hrw.org/news/2018/06/01/uae-award-winning-activist-jailed-10-years.

attempt to capture another human rights activist, Omar Abdulaziz, an associate of the late Jamal Khashoggi, but his two brothers are imprisoned without formal charges.[18]

The peril is not limited to political activists. Compromised technology could result in increased threats to people whose sexual orientation has been criminalized. For example, in Iran, the criminalization of same-sex relations led OTF to undertake an investigation into the security of dating app platforms and work directly with the platforms to improve security and protect vulnerable users.[19] In addition, many lawyers rely on OTF-supported technologies to protect the confidentiality of client communications.[20]

Accordingly, in urging citizens of repressive regimes to use its technologies to protect themselves, OTF is often asking users to trust it with their liberties and

---

[18] David Kirkpatrick, *Israeli Software Helped Saudis Spy on Khashoggi, Lawsuit Says*, N.Y. TIMES (Dec. 2, 2018), https://www.nytimes.com/2018/12/02/world/middleeast/saudi-khashoggi-spyware-israel.html.

[19] Open Tech. Fund, *2015 Annual Report*, at 19-20, https://public.opentech.fund/documents/2015otfannualreport.pdf.

[20] *See* Jan L. Lacobowitz & Justin Ortiz, *Happy Birthday Siri: Dialing in Legal Ethics for Artificial Intelligence, Smartphones, and Real Time Lawyers*, 4 TEX. A&M J. PROP. L. 407, 439 (2018); Sean La Roque-Doherty, *Alternatives to Email Give Law Clients Secure Communication Options*, ABA JOURNAL (Oct. 1, 2018), https://www.abajournal.com/magazine/article/alternatives_email_secure_communication.

even their lives. To develop that trust, OTF cultivates direct relationships with democracy movements around the world. For example, OTF has worked hard to develop relationships with Internet freedom experts and technologists in Hong Kong, including civil society organizations, media outlets, and academic institutions.[21] More broadly in China, OTF has continuously partnered with international media outlets, academic institutions, and local civil societies to raise awareness and provide the proper tools to people so they can retain their Internet freedom and privacy, a fundamental human right.[22] OTF has developed similar relationships with human rights organizations in Iran and elsewhere.[23]

OTF has been successful at persuading such partners to trust in its technologies in large part because it is perceived as independent from the influence of any government, including the United States. OTF's foreign partners understand that OTF has a single mission of promoting Internet freedom, while the United States Government's interest are wide ranging and often conflicting. A dissident in Iran, for example, might worry that an agency controlled by the U.S. government may be tempted to distribute digital tools that allow intelligence gathering, particularly in

---

[21] Open Tech. Fund, *On Community Building & Rapid Response*, https://www.opentech.fund/news/community-building-rapid-response/.

[22] *Ibid*.

[23] *Ibid*.

the wake of extensive international coverage of Edward Snowden's revelations regarding the massive scope of NSA secret surveillance programs. At the same time, someone in Saudi Arabia might reasonably worry that OTF's ordinary objectives may be compromised at particular times and places in pursuit of diplomatic or other policy objectives that strike American government officials as more pressing.

This faith in OTF's independence is particularly important in countries like Venezuela, where changes in leadership over the years have been alternately supported and opposed by various Administrations. Activists in such countries need to trust that the tools they rely upon are not subject to change as a result of a new position or strategic decision in the U.S. government.

The public perception of OTF's independence is all the more important for the millions of users who lack the technical sophistication to directly assess the security and reliability of OTF's tools. For them, OTF's reputation is the only real source of assurance that its tools are safe to use.

It should come as no surprise, then, that the very public government takeover of OTF has already started undermining OTF's international reputation for independence and its ability to fulfill its mission. In a recent letter, a group of "activists, human rights defenders and leaders of public interest groups and nonprofits working at the intersection of human rights and technology," told members of Congress that OTF has been "one of the most trusted" sources of

solutions for promoting internet freedom.[24] That trust, they explain, is "tied to OTF's independence from the US government." *Ibid*. And that trust "is threatened by Michael Pack's recent actions, including his attempts to dismantle OTF's bipartisan board; wantonly dismissing its CEO and President; and installing leadership with no technical expertise, track record of community engagement, or relevant experience." *Ibid*. "Without the ability to carry out its mission fully independently from USAGM overreach," the signatories explained, "we would no longer be able to trust OTF or endorse the programs it funds." *Ibid*.; *see also, e.g.*, Laura Turner Decl., ECF 26-7 ¶ 9 (letter to OTF from individual working on important human rights issues in China, including the Hong Kong protests and the ongoing abuses in Xinjiang, stating he would not work with OTF because the organization "has lost credibility as a result of Pack's recent actions").

Particularly in conjunction with Director Pack's concurrent firing of the boards of Radio Free Europe and Radio Free Asia—which was widely perceived as intended to force those broadcasters to alter their operations to suit the political

---

[24] Letter to Congress: Regarding the Independence and Community Trust of the Open Technology Fund, MEDIUM (July 22, 2020), *available at* https://medium.com/@community.space/open-letter-re-the-independence-and-community-trust-of-the-open-technology-fund-893db83f7714.

messaging and agenda of the current administration[25]—the world has had reason to worry whether OTF will remain a reliable, independent partner. Indeed, OTF reports that the number of requests for assistance from its rapid response program has fallen dramatically—by 33 percent—over the past month in the aftermath of USAGM's attempted takeover.[26]

Accordingly, it would be more than a little surprising if Congress, fully understanding the importance of OTF's international record and reputation for independence, nonetheless authorized USAGM to publicly destroy that reputation by summarily taking over its board. It would be downright shocking if OTF had invited that result through its bylaws. Rather than give the statute and bylaws such an unexpected interpretation, the Court should adopt the reasonable reading OTF has provided.

---

[25] *See, e.g.*, Dan De Luce, *Trump's New Global Media Chief Fires Top Editor at Radio Free Asia*, NBC NEWS (July 9, 2020), https://www.nbcnews.com/news/europe/trump-s-new-global-media-chief-fires-top-editor-radio-n1233321.

[26] Open Tech. Fund, *On Community Building & Rapid Response*, https://www.opentech.fund/news/community-building-rapid-response/.

## II. The Government's Reading Of The Statute Would Render It Unconstitutional Under The First Amendment.

There are other reasons to resist the Government's position as well. For one thing, the Government's reading of the statute would render it unconstitutional under the First Amendment.

It is worth pausing on how remarkable the Government's interpretation of the statute truly is. Director Pack claims that Congress authorized a federal agency to unilaterally remove the leadership of a private, non-profit organization engaged in political advocacy because it began as a project of another federally funded organization and itself receives federal funding. While governments in other parts of the world may have the power to put their own people in control of the nation's media, communications networks, businesses, and social groups, the independence of private entities and civil society groups from the government is a hallmark of our democracy. A decision from this Court holding that Congress has the power to take control of such independent private entities would be unprecedented and cast a long shadow. The Government provides funds—through grants, subsidies, or preferential tax treatment—to innumerable private groups and businesses throughout our society, and sometimes fosters the development of such groups. Many *amici* receive government financial support in one form or another for their work promoting Internet access and freedom here and abroad.

An involuntary government takeover of such private institutions is incompatible with the First Amendment. The "right to engage in activities protected by the First Amendment implies 'a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548 (1987) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "Government actions that may unconstitutionally burden this freedom may take many forms, one of which is 'intrusion into the internal structure or affairs of an association.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (quoting *Roberts*, 468 U.S. at 623). There "can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623. Neither may the Government attempt to control a group's leadership, which goes beyond selecting members of the group and could readily impinge on control over the organization, its resources, and its message. Thus, the Court has struck down laws that "dictate[d] the organization and composition of [private] bodies," such as political parties. *Eu v. S.F. Co. Democratic Cent. Comm.*, 489 U.S. 214, 216 (1989). The Court explained that freedom of association "encompasses a political party's decisions about the identity of, and the process for electing, its leaders." *Id*. at 229. The Court has applied the same principle to government interference with the leadership of

non-political groups as well. *See Dale*, 530 U.S. at 644 (applying same rule to Boy Scouts).[27]

There can be no dispute that OTF's efforts to promote democracy and Internet freedom implicate core expressive associational freedoms. *See supra* § I. In the digital age, Internet freedom is an essential enabler of human rights, including the freedoms of opinion and expression, privacy, and peaceful assembly and association, which the Government has affirmed through, inter alia, its ratification of the International Covenant on Civil and Political Rights.[28] Nor can there be any doubt that replacing OTF's leadership with individuals chosen by the Government places a substantial burden on that right. *See Dale*, 530 U.S. at 644; *Eu*, 489 U.S. at 216. Any law authorizing such burdens would be unconstitutional unless it "serve[d] a compelling state interest." *Eu*, 489 U.S. at 231. The Government has not even tried to show that such an interest supports its hostile takeover of OTF. Indeed, the only remotely cognizable governmental interest the Government could claim now would

---

[27] *Cf. also Hosanna-Tabor v. EEOC*, 565 U.S. 171, 189 (2012) (recognizing severe impairment of First Amendment rights occasioned by government interference with religious school's selection of its teachers and other officials).

[28] *See* International Covenant on Civil and Political Rights, art. 17-22, Dec. 16, 1966, 999 U.N.T.S. 171, 177-78.

arise from the fact that the organization accepts federal funding.[29] But as discussed next, the Government's actions in this case far exceed any control the Constitution permits it to exercise over OTF as a grant recipient.

## III. The Government's Position Contravenes Settled Limits On The Government's Power To Condition Federal Grants.

The district court dismissed any First Amendment concerns on the ground that OTF agreed to government control of its board by accepting a funding condition that gave USAGM that power and then incorporating conforming language in its bylaws. *See* Op. 24 n.18. OTF explains why that interpretation of the bylaws and the funding condition is wrong on the face of the provisions. But if there were any doubt, it is removed by consideration of the constitutional limits on the Government's power to attach conditions to federal funds.

### A. Spending Clause Conditions Must Be Unambiguous.

Grant conditions operate "much in the nature of a contract: in return for federal funds, the [grantees] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The

[29] A different question would have been presented when OTF was a unit of Radio Free Asia, a quasi-governmental organization created by Congress. But the Government does not dispute that OTF is now an entirely independent, private organization. Nor has it attempted to explain why OTF's origins should strip it of the First Amendment protections enjoyed by other private, independent advocacy groups.

"legitimacy" of the Government's exercise of power over the grantee "thus rests on whether the [grantee] voluntarily and knowingly accepts the terms of the 'contract.'" *Ibid.* "There can, of course, be no knowing acceptance if a [grantee] is unaware of the conditions or is unable to ascertain what is expected of it." *Ibid*. "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so *unambiguously*." *Ibid.* (emphasis added); *see also South Dakota v. Dole*, 483 U.S. 203, 213 (1987) ("[T]he conditions imposed must be unambiguous."). "By insisting that Congress speak with a clear voice," the courts enable grant recipients to "exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17.[30]

The district court's interpretation of the grant language disregards "the clear statement rule of *Pennhurst*." *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001). The court candidly admitted that the relevant language of the grant condition was "ambiguous." Op. 20. That should have ended the inquiry, requiring the court to conclude that OTF was *not* required to submit to Government control over its board as a condition of receiving federal funds. Moreover, because the district court's construction of the bylaws depended significantly on its belief that the funding

---

[30] This clear statement rule applies whether the recipient is a State, *see ibid*., or a private entity, *see, e.g.*, *Grove City College v. Bell*, 465 U.S. 555, 575 (1984).

condition required such a surrender, Op. 20-22, its interpretation of the bylaws cannot stand either.

### B. Requiring OTF To Agree To Government Control Of The Organization As A Condition For Receiving Federal Grants Would Constitute An Unconstitutional Condition.

The Supreme Court has also recognized that a funding condition implicating First Amendment rights, even if unambiguously expressed, may "go beyond" offering grantees a "'reasonable' choice" and "become an unconstitutional condition." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006); *see also, e.g.*, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (*USAID*). The Government crosses that line when it imposes conditions that do not simply "define the limits of the government spending program" but instead "seek to leverage funding to regulate speech outside the contours of the program itself." *USAID*, 570 U.S. at 214-15. Put another way, "'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (emphasis in original).

Here, the district court's interpretation of the funding condition (and the Government's interpretation of the statute) would allow a federal agency to take

complete control of a *recipient*, allowing it to determine not only how OTF's federal funds are spent, but also how the organization conducts *any* program it conducts, whether government funded or not.[31]

At a minimum, that interpretation raises serious questions under the unconstitutional conditions doctrine, which should be avoided by adopting OTF's far more natural reading of its own bylaws.

## IV. Even If OTF's Bylaws Invited USAGM To Appoint Its Board, The Agency Lacked Legal Authority To Accept The Invitation.

The district court's reliance on its interpretation of OTF's bylaws is flawed for an additional reason as well. The court simply assumed that if a private organization invites a federal agency to control its board, a federal official may lawfully accept that invitation. That is a surprising assumption. Suppose, for example, Boeing or another defense contractor enacted a provision in its bylaws allowing the Secretary of Defense to appoint some or all of its board. Courts would

---

[31] To date, OTF has not received funding from private sources, but Congress's most recent appropriation for OTF required that "funds made available pursuant to this section shall be matched, to the maximum extent practicable, by sources other than the United States Government, including from the private sector." Further Consolidated Appropriations Act of 2020, Pub. L. No. 116-94, § 7050(a), 133 Stat. 2534, 2913-14 (2019). Moreover, although the Supreme Court has allowed the Government to attach conditions to federal funds that dictate the operation of a federally funded program, *see, e.g.*, *Rust*, 500 U.S. at 192-200, to *amici's* knowledge, the Court has never countenanced the Government going so far as to insist that it be allowed to appoint the officials who run an otherwise private entity as a way of controlling the use of the federal grant.

not simply assume the Secretary could lawfully accept that invitation, particularly given that Congress would have substantial reasons to refuse to allow such entanglement between the Department and its contractors.

In fact, this Court and the Supreme Court have repeatedly held that federal agencies' power to regulate private parties "cannot arise from the absence of objection, or even from affirmative agreement." *Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 463 (D.C. Cir. 2005) (citing *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 652 (1973); *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004); *Am. Mail Line Ltd. v. FMC*, 503 F.2d 157, 170 (D.C. Cir. 1974)). The same principle applies here. When a federal official, acting in her official capacity, appoints members to the board of a private organization, she is exercising the authority of her office. As with any other exercise of official authority, there must be a legal basis for the official's exercise of power, which Congress is entitled to control.

Accordingly, there is no question that Director Pack required congressional authorization to exercise *unilateral* control over OTF's board. Particularly because such action has serious policy and constitutional implications, *see supra* §§ II-III, the question whether to permit such action belongs to Congress in the first instance. The need for congressional authorization does not disappear simply because a private party invites regulation. While the regulated party's consent may affect

Congress's views on whether to permit the official to take an action, the legislature may nonetheless decide against allowing the official to take up the invitation. In the Boeing example, for instance, Congress would likely be concerned over the appearance and reality of favoritism and conflicts of interest. Likewise in this case, Congress could well conclude government control of OTF's board would undermine the effectiveness of the OTF programs the federal government funds, even if—contrary to all evidence—OTF thought differently and was willing to cede its autonomy to the agency.

In fact, had the district court asked the question, it would have been compelled to conclude that Congress did *not* authorize Director Pack to take control of OTF's board, even with OTF's permission. The only plausible candidate for such authority is 12 U.S.C. § 6209, which the district court rightly construed as authorizing the agency to select the boards of *other* government-created entities, but *not* OTF. *See* Op. 12-19. This intentional omission not only fails to confer authority in itself; it is fairly understood to preclude the Government from arguing that any more general source of agency power gives it the authority Congress intentionally withheld in the provision most directly addressing the question.

Again, however, this Court need not traverse this separation-of-powers thicket. Like the other constitutional difficulties the Government's arguments raise,

this one too can be easily avoided by adopting OTF's reasonable construction of its own bylaws.

## CONCLUSION

The Court should reverse the district court's denial of plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

/s/ Kevin K. Russell
Kevin K. Russell
Charles H. Davis
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
(800) 574-2033 (fax)
krussell@goldsteinrussell.com
cdavis@goldsteinrussell.com

*Counsel for Amici Curiae*

Dated: July 24, 2020

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) this document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), this document contains 5,743 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

July 24, 2020

/s/ *Kevin K. Russell*
Kevin K. Russell

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on July 24, 2020. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Kevin K. Russell*
Kevin K. Russell

# ADDENDUM

## Identity of *Amici Curiae*

**Access Now** is an international civil society organization founded in 2009 and registered 501(c)(3) non-profit in the United States of America that defends and extends the digital rights of users at risk. Through policy development and advocacy, legal interventions, grant making, multi-stakeholder conventions like RightsCon, and direct technical support through a Digital Security Helpline, the organization works through staff in more than fifteen countries to monitor, investigate, and prevent violations of digital rights worldwide.

**The App Coalition** advocates for public policies that will ensure consumers have unfettered access to the applications and content of their choosing, on their personal devices, including mobile phones and tablets, which requires a market free from control by artificial barriers, such as those created by gatekeepers (private or governmental).

**ARTICLE 19** is a non-profit corporation that works for a world where all people everywhere can freely express themselves and actively engage in public life without fear of discrimination. ARTICLE 19 is a recipient of funding from OTF to support capacity building for internet freedom communities.

**The Benton Institute for Broadband & Society** is part of the legacy of Senator William Benton, who founded the William Benton Foundation in 1948. Its mission is to articulate a public interest vision for the digital age and to demonstrate

the value of communications for solving social problems. As Assistant Secretary of State for Public Affairs, Senator Benton led the process of converting World War II radio services operated by the Office of War Information into a civilian system designed to promote democratic values throughout the world. The central element of that program was creation of the Voice of America, and Senator Benton is generally regarded as its progenitor. The Open Technology Fund is a contemporary implementation of Senator Benton's efforts.

**The Center for Democracy and Technology** is a non-profit public policy organization that works to promote democratic values, human rights, and civil liberties—including free expression, privacy, and open access. For more than 25 years, CDT has represented the public's interest in an open, decentralized Internet, worked to ensure that constitutional and democratic values are protected in the digital age, and promoted technologies that empower and protect people against oppressive government surveillance and censorship.

**The Center on Privacy & Technology at Georgetown Law** is a think tank whose work focuses on the impacts of government surveillance and commercial data practices on vulnerable communities. Protecting the privacy of vulnerable communities, who are often the subject of disproportionate government and commercial surveillance, is essential to ensuring that all communities can participate fully in democracy and society. The Center on Privacy & Technology has an interest

in preserving trustworthy privacy-enhancing technologies and tools relied upon by vulnerable communities around the world to defend themselves from government and commercial surveillance.

**The Committee to Protect Journalists** is an independent, non-profit organization that promotes press freedom worldwide. We defend the right of journalists to report the news safely and without fear of reprisal. CPJ has not taken funding from OTF.

**Electronic Frontier Foundation** is a non-profit civil liberties organization with more than 30,000 dues-paying members that has worked for 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF has been a repeated recipient of funding from OTF, at amounts no more than 3% of EFF's overall budget, to support the technical development of software to make the Internet more secure. EFF also works worldwide to support digital security and fight censorship and overbroad surveillance, including assistance with training and publicizing human rights violations against digital activists and technologists, who are often targeted by repressive regimes.

**Free Press** is a national, non-partisan, non-profit organization working for equitable access to technology, diverse and independent ownership of media platforms, and journalism that serves the interests of local communities. It centers racial justice and social justice in its advocacy, in the belief that technology can and

should be a tool for liberation, but that it also can become a tool for surveillance and oppression in the hands of powerful governmental and corporate actors. Free Press is not a recipient of OTF funding or any government funding. Yet like other *amici*, Free Press is dedicated to promoting and protecting people's rights to use the Internet and other essential communications tools. The organization and its constituents rely upon technologies developed by OTF to advance their respective interests and missions, and to secure their own communications against censorship and surveillance.

**Human Rights Watch** is a non-governmental organization, originally established in 1978 as the Fund for Free Expression and headquartered in New York. Its mission is to expose violations of fundamental human rights, end abuses, and provide victims a voice. HRW operates around the world, partnering with local human rights defenders, victims, and witnesses to document violations of international human rights in over 100 countries. Its staff and its partners often exchange information in extremely dangerous conditions, under risks from armed conflict, terrorist groups, and authoritarian governments. It relies on secure technologies to keep its staff and partners safe and to enable it to inform the public of grave abuses and prompt governments to press for their cessation and remedy.

**Media Alliance** is a Northern California regional democratic communications advocate. Our membership includes professional and citizen journalists,

researchers, academics, and community activists who do media and communications work. Our constituency values and relies upon encrypted communications to safeguard themselves and their associates and sources when working on controversial issues in the public interest. OTF's tools are a very important part of their working toolkit.

**Media Democracy Fund**, a project of New Venture Fund, is a catalyst for an open, secure and equitable Internet. It brings together diverse voices to design inclusive and responsible solutions, and empower public interest advocates to create an environment where digital technologies and the Internet have a long-term, positive impact on society.

**Mozilla Corporation** is a global, mission-driven organization that works with a worldwide community to create open source products like its web browser, Firefox. Its mission is guided by a set of principles that recognizes, among other things, that individuals' security and privacy on the Internet are fundamental and must not be treated as optional.

**Open Technology Institute** is a multi-faceted technology policy and advocacy program based in Washington, DC under the broader New America Foundation umbrella. OTI works at the intersection of technology and policy to ensure that every community has equitable access to digital technology and its benefits. We promote universal access to communications technologies that are both

open and secure, using a multidisciplinary approach that brings together advocates, researchers, and innovators. OTI's staff and its partners regularly use tools supported by OTF, particularly open source tools, to keep their communications safe and secure.

**Ranking Digital Rights** is a research program at New America that promotes human rights online by establishing and advancing global norms for transparency and accountability in the tech sector. We publish the annual RDR Corporate Accountability Index, which ranks the world's most powerful digital platforms and telecommunications companies on their disclosed commitments, policies, and practices that affect privacy and free expression.

**The Tor Project** is a 501(c)(3) non-profit with a mission to advance human rights and freedoms by creating and deploying free and open source anonymity and privacy technologies, supporting their unrestricted availability and use, and furthering their scientific and popular understanding. Since 2006, the Tor Project and its technologies have helped millions of users every day to circumvent censorship and use the Internet privately and securely.

**The Wikimedia Foundation** is a non-profit organization based in San Francisco, California, which operates twelve free-knowledge projects on the Internet, including Wikipedia. Wikimedia's mission is to develop and maintain factual and educational content created and moderated by volunteer contributors,

and to provide this content to people around the world free of charge. In June, the Wikimedia projects received nearly 22 billion page views, including 9.6 billion page views on English Wikipedia. That month, users submitted over 23 million edits to Wikipedia. Since its creation, users have created over 54 million articles on Wikipedia.